**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANA HOLLINGER, | ) | CASE NO. 1:23-CV-00418-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | BENITA Y. PEARSON |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Dana Hollinger ("Ms. Hollinger") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI"). U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

Ms. Hollinger previously filed an application for SSI, which an ALJ dismissed at Ms. Hollinger's request on December 15, 2015. (Tr. 16, 87-90.)[1] On August 26, 2020, Ms. Hollinger filed a new application for SSI, alleging a disability onset date of September 19, 2019. (*Id.*) Her application relates to sciatic nerve damage, chronic back pain, depression, and anxiety. (Tr. 193,

---

[1] The administrative transcript ("Tr.") appears at ECF No. 5 on CM/ECF.

200.) Her application was denied initially and upon reconsideration. (Tr. 67-86, 92-98). On December 15, 2021, an ALJ held a telephone hearing due to the COVID-19 pandemic where Ms. Hollinger, represented by counsel, and a vocational expert ("VE") testified. (Tr. 37-62.) The ALJ issued a written decision on January 11, 2022, finding that Ms. Hollinger was not disabled under the meaning of the Social Security Act. (Tr. 16-30.) The ALJ's decision became final on January 24, 2022, when the Appeals Council declined further review. (Tr. 1-6.) On March 2, 203, Ms. Hollinger filed a Complaint, challenging the Commissioner's final decision. (ECF No. 1.) She raises the following assignments of error:

(1) The ALJ erroneously failed at Step Two of the Sequential Evaluation to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments when forming the RFC.

(2) The ALJ erred when she failed to find persuasive the opinion of the treating certified psychiatric nurse practitioner and either find that Plaintiff satisfied the criteria of Listings 12.04 or 12.06 and/or incorporate the stated limitations into her RFC.

(3) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of all Plaintiff's symptoms, including fatigue, precluded her from performing substantial gainful activity on a full-time and sustained basis.

(ECF No. 6, PageID#1086.)

### III.    BACKGROUND INFORMATION

#### A.  *Personal, Educational, and Vocational Experience*

Ms. Hollinger was born in 1987, and she was 32 years old on the application filing date. (Tr. 29.) She lives alone. (Tr. 41.) She attended one year of college. (*Id.*) She has a driver's license, but she does not currently drive because she does not have access to a vehicle. (Tr. 41-42.) Her past relevant work was employment as a stock clerk. (Tr. 29.)

**B.** *Relevant Hearing Testimony*

### 1. <u>Ms. Hollinger's Testimony</u>

Ms. Hollinger testified that she last worked for a few weeks in September 2021, driving a rental car for Uber. (Tr. 42.) She drove four to five days per week for one to four hours per day. (*Id.*) She stopped working for Uber because she was not earning enough to pay for the rental car. (Tr. 42-43.) Ms. Hollinger stated that even if she owned a car, she would not have been able to continue work as an Uber driver because she is unable to sit for more than two hours. (Tr. 45.) She stated that this sitting issue likely has to do with nerve damage. (Tr. 46.) She is receiving treatment for her condition, including physical therapy, hydrotherapy, aquatic therapy, and medications. (*Id.*)

Ms. Hollinger further testified that she was "somewhat bedridden" due to her physical pain and depression. (*Id.*) Her anxiety makes it difficult for her to work outside of her home. (*Id.*) She stated that her mental health conditions also interfere with her focus. (Tr. 47.) She stated that she is nervous interacting with people outside of the home but also admitted she dealt with people "fairly well" when driving for Uber. (*Id.*) She also stated that her fatigue has become "more and more extreme." (*Id.*) She testified that she has "[r]ather frequent migraines" and that she was "winded and in agony" by the time she climbed the stairs to her home, which in turn exacerbated her anxiety and depression. (*Id.*)

Ms. Hollinger stated that she cannot keep her house clean, wash dishes, or stand to vacuum. (Tr. 48.) She also finds it difficult to bathe herself. (*Id.*) She shops online and prepares her own meals. (*Id.*) She stated she does not "keep up" with her laundry and that she washes her clothes by hand. (*Id.*) She also described her typical day when she is not at work. (*Id.*) She stated that she sleeps up to 10 to 12 hours a day but stated that her sleep is "choppy." (*Id.*) She writes stories on her computer and plays computer games for fun. (Tr. 49.) She used to spend hours writing on her

computer but stated that she had been a "little bit too down" currently to do much writing. (*Id.*) She interacts with others via social media, Discord, and Facebook. (*Id.*) She also interacts with her landlord and downstairs neighbor. (*Id.*)

Ms. Hollinger testified that she was unable to continue online college courses for an associate degree in business administration due to financial issues. (Tr. 50.) She stated that she had been in an accelerated program and took one to two courses per month. (*Id.*) She stated she spent six hours per day, five to six days per week, doing schoolwork, though her schedule was very flexible. (Tr. 51.) She completed seven to eight semesters before stopping due to mental health issues. (*Id.*)

Ms. Hollinger stated that she loses concentration/focus while watching television, writing, and playing games, and she reported decreased interest in her hobbies. (Tr. 51-52.) She reported decreased energy, fatigue, and depression.  (Tr. 52.) She stated that her depression was caused in part by her pain. (Tr. 52.) She testified that she has difficulty showering even when using a shower stool. (*Id.*)

Ms. Hollinger stated that she gained over 120 pounds since losing her job at Home Depot. (Tr. 53-54.) She lost her job because her pain made it difficult to get to work "at all or on time on some days." (Tr. 55.) At the time of the hearing, she was 5'6" and 350 pounds. (Tr. 53.) She addresses this issue by engaging in physical therapy and attempting to leave home by going up and down the stairs. (Tr. 54.)

### 2. <u>Vocational Expert's Testimony</u>

The ALJ first asked if a hypothetical individual with Ms. Hollinger's age, education, and work experience could perform work if limited to performing simple, routine tasks, but not a production rate pace; frequent interactions with supervisors, coworkers, and the public; and

occasional routine workplace changes. (Tr. 57.) The VE opined that the individual could not perform past relevant work but could perform other work such as a kitchen helper, hand packager, and industrial cleaner. (*Id.*)

Ms. Hollinger's counsel asked the VE about an employer's tolerance for absences and off-task behavior. (Tr. 58.) The VE opined that employer would tolerate no more than one day per month, and off-task behavior exceeding 10% would be work-preclusive. (*Id.*)

Ms. Hollinger's counsel then asked the VE if an individual could maintain employment if she was repeatedly late or called in sick. (*Id.*) The VE stated that an employer would tolerate no more than one day per month. (*Id.*) The VE further stated that being tardy on three occasions would count as an absence that would result in a warning and progressive discipline. (*Id.*) The VE opined that being repeatedly late would be work-preclusive. (*See* Tr. 58-59.)

Ms. Hollinger's counsel asked whether an individual could perform work if they are unable to perform at a consistent pace, meaning that her off-task behavior exceeds 10% of the workday. (Tr. 59.) The VE stated that this individual would not be able to maintain employment. (*Id.*) Ms. Hollinger's counsel also asked if the individual could perform if limited to no interaction with the general public. (*Id.*) The VE opined that the jobs proposed in the first hypothetical would still be available because none of them require public interaction to perform the essential functions of the job. (*Id.*) Finally, Ms. Hollinger's counsel asked if an individual could get through the training period or perform the VE's opined positions if limited to only occasional or less supervision. (*Id.*) The VE opined that the proposed jobs could still be performed even with reduced interaction levels with one's supervisor. (Tr. 60.)

### C.  *Relevant Non-Medical/Medical Opinion Evidence*

#### 1.  <u>State Agency Opinions</u>

### a. Physical Consultants

In October 2020, Lynne Torello, M.D., reviewed the medical record at the initial level of consideration. Dr. Torello opined that there were no severe impairments noted in the medical evidence. (Tr. 70.) Gary Hinzman, M.D., reviewed the medical record at the reconsideration level in April 2021 and agreed with Dr. Torello's findings. (Tr. 80.)

### b. Psychological Consultants

In November 2020, Janet Souder, Psy.D., reviewed the record at the initial level of consideration. Dr. Souder opined that Ms. Hollinger is capable of understanding and remembering simple, one to two and three to four multi-step instructions in an unskilled work environment. (Tr. 73.) Dr. Souder further opined that Ms. Hollinger can complete simple and routine tasks in a predictable work environment where pace is not fast and there are no strict time or production quotas. (*Id.*) Dr. Sounder also opined that Ms. Hollinger is capable of brief, superficial interactions with co-workers and supervisors, and would be limited to brief, superficial interactions with the public. (Tr. 74.) Dr. Souder opined that Ms. Hollinger is capable of adapting to a structured and predicated work setting with infrequent changes in job responsibilities and expectations. (*Id.*) In May 2021, Kristen Haskins, Psy.D., reviewed the record at the reconsideration level. Dr. Haskins agreed with Dr. Souder's findings. (Tr. 83-84.)

### 2. **James Ward, APRN, CNP**

In December 2021, Nurse Ward completed a Mental Impairment Questionnaire for Ms. Hollinger. (Tr. 1065-66.) Nurse Ward wrote that Ms. Hollinger had bipolar II disorder and generalized anxiety disorder. (Tr. 1065.) Nurse Ward indicated that Ms. Hollinger takes lurasidone, lamotrigine, hydroxyzine, buspirone, and doxepin, and described the side effects of these medications as fatigue, drowsiness, sedation, lethargy, and GI "side effects." (*Id.*) Nurse

Ward opined that Ms. Hollinger is unable to meet competitive standards[2] regarding her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; manage regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonably number and length of rest periods; remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; and interact appropriately with the general public. (Tr. 1065-66.)

Nurse Ward also opined that Ms. Hollinger is seriously limited, but not precluded[3] from activities that require the ability to sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavior extremes. (*Id.*) Nurse Ward further opined that Ms. Hollinger had limited but satisfactory ability to carry out very short and simple instructions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (*Id.*) Nurse Ward opined that Ms. Hollinger would be absent from work 3 to 5 days a month and off-task 75% of the time. (Tr. 1066.)  In support of the opined limitations, Nurse Ward pointed to the clinical findings of chronic mood dysregulation and anxiety, impaired ability to concentrate due to anxiety, and chronic fatigue and insomnia. (Tr. 1065.)

---

[2] The Mental Impairment Questionnaire defines "unable to meet competitive standards" to mean that the claimant "cannot satisfactorily perform th[e] activity independently, appropriately, effectively, and on a sustained basis in a regular work setting." (Tr. 1065.)

[3] The Mental Impairment Questionnaire defines "seriously limited, but not precluded" to mean that the claimant's "ability to function in this area is less than satisfactory, but not precluded in all circumstances." (Tr. 1065.) The claimant would be limited in their ability to perform the activity 15% of the time. (*Id.*)

### D. *Relevant Medical Evidence*[4]

#### 1. <u>Obesity and Back Pain</u>

The medical records indicate a history of low back and right hip pain. (Tr. 19; *see, e.g.*, Tr. 289, 293, 306, 311, 318, 339, 350, 378.) An x-ray of Ms. Hollinger's lumbar spine was normal, revealing no spondylolisthesis, maintained vertebral body heights, relatively well-maintained intervertebral disc space heights, no acute osseous abnormality, and posterior elements within normal limits. (Tr. 404.) Ms. Hollinger attended physical therapy for her pain, but care was discontinued in October 2019 because she did not return to therapy or schedule additional follow-up appointments. (Tr. 350-51.) Prior to the application filing date, the medical record also indicates a history of obesity. Specifically, an examination from June 5, 2020, revealed that Ms. Hollinger had a BMI of 43. (Tr. 306-07.)

On September 28, 2020, Ms. Hollinger went to Adriana Whelan, APRN, CNP, for a PAP smear and flu shot. (Tr. 516.) The section of the treatment notes labeled "Assessment and Plan" indicates that Ms. Hollinger had chronic bilateral low back pain without sciatica and a treatment plan consisting of meloxicam, lidocaine, and cyclobenzaprine. (Tr. 519.) Ms. Hollinger attended a telehealth session for a follow-up evaluation and management of her mood and anxiety on March 18, 2021. (Tr. 575.) She told James Ward, APRN, CNP, that she was trying to practice self-care because of her back pain. (*Id.*)

---

[4] The Initial Order states, "Any facts recited in support of the "Argument" or "Analysis" section of the brief must also be set forth in the "Facts" section of the brief." (ECF No. 5, PageID#15.) Ms. Hollinger's "Law and Argument" section, in direct violation of this Court's order, cites evidence not discussed in her "Statement of the Facts." (ECF No. 6, PageID#1087-89 (statement of facts solely discussing evidence related to her mental impairments and hearing testimony); *see, e.g.*, ECF No. 6, PageID#1093-95 (merits brief argument citing evidence related to obesity, chronic back pain, and migraines). Courts in the Northern District of Ohio have previously warned Ms. Hollinger's counsel about this practice. *See, e.g.*, *Garcia v. Comm'r of Soc. Sec.*, No. 1:22-cv-1044, 2023 WL 2333520, at *7 n.11 (N.D. Ohio Jan. 27, 2023) (Grimes, M.J.); *Tollon v. Comm'r of Soc. Sec.*, No. 1:21-CV-1507, 2022 WL 2610518, at *2 n.5 (N.D. Ohio May 3, 2022) (Greenberg, M.J.).

On August 5, 2021, Ms. Hollinger presented for a follow-up appointment for chronic back pain with recurrent sciatica. (Tr. 624.) She reported that physical therapy did not work so she "quit a long time ago." (*Id.*) She told her primary provider that she gained 100 pounds during the COVID-19 pandemic due to her inability to get fresh fruits and vegetables. (*Id.*) She stated that the pain was "too much," and that she could not stand and work for a long time. (*Id.*) She said that the pain was better with sitting and best when lying down. (*Id.*) She also stated that she was unable to exercise or walk due to weight gain and pain. (*Id.*) Examination revealed Ms. Hollinger weighed 353 pounds, rendering a BMI of 56. (Tr. 625.) The examination also revealed that Ms. Hollinger had low and mid back pain and decreased lumbar rage of motion. (*Id.*) She walked with a limping gait favoring her right leg, but she demonstrated no neurological deficit. (*Id.*)

On November 4, 2021, Garret LaSalle, M.D., a pain specialist, examined Ms. Hollinger for back pain. (Tr. 968.) Dr. LaSalle's examination revealed that palpating parts of Ms. Hollinger's leg reproduced her pain complaints and that she had poor biomechanics when she walked; however, she had normal reflexes and strength. (Tr. 970.) Dr. LaSalle explained Ms. Hollinger was overreactive to palpation, likely tied to somatic problems connected with her psychiatric state. (*See id.*) Dr. LaSalle stated the following:

> [P]ersistent back pain with diffuse tenderness that persists multiple years after minor trauma with evidence of somatic hyperalgesia on examination is most consistent with central sensitization to pain playing the primary role in the patient's pain complaints (exacerbated by depression, PTSD, bipolar disorder, and anxiety and manifesting as chronic myofascial pain). Hypovitaminosis D and physical inactivity also appears to be contributing to her pain complaints.

(Tr. 970.) Dr. LaSalle referred Ms. Hollinger to physical therapy and bariatric treatment; prescribed muscle relaxer and low-dose naltrexone; instructed her to improve her diet; and told her she should walk and bike with a goal of reaching 30 minutes of activity every day. (Tr. 971.)

## 2. **Migraine Headaches**

Prior to the relevant period, Ms. Hollinger's medical record reflects notations in the "Past Medical History" section that she had "rare" migraines with aura. (Tr. 289, 293, 303, 340, 346, 367.) Also prior to the relevant period, her reported active problems at visits indicated she had migraines with aura. (Tr. 305, 317, 362.)

On May 24, 2020, Ms. Hollinger attended an appointment. A review of systems indicated that Ms. Hollinger was positive for a migraine. (Tr. 370.) Her encounter diagnosis was a non-intractable migraine without aura and without status migrainosus. (Tr. 372.)

Ms. Hollinger had an office visit with Adriana Whelan, APRN, CNP on August 21, 2020. Nurse Whelan's primary diagnosis for Ms. Hollinger was an intractable migraine with aura without status migrainosus. (Tr. 249.)

A November 2, 2020, inpatient appointment note's "Medical History" section indicated that she had a past history of migraine headaches. (Tr. 914.)

Counseling appointment notes from January 12, 2021 and January 28, 2021 indicate in the "Service Plan" section that to reduce migraines, Ms. Hollinger would maintain medication compliance and "obtain[] rest daily." (Tr. 501, 565.) Neither of the notes indicates any reports of current headaches at the time of the counseling appointment. (*See id.*)

On August 28, 2021, Ms. Hollinger's visit diagnosis was an intractable migraine with aura without status migrainosus. (Tr. 611.) Ms. Hollinger was prescribed Imitrex to take orally once as needed for her migraine. (Tr. 612.)

## 3. **Mental Impairments**

On June 4, 2020, Ms. Hollinger was admitted for six days of inpatient treatment for suicidal ideation. (Tr. 288.) On June 6, 2020, her GAF score reflected "some impairment in reality testing

or communication or major impairment in several areas." (Tr. 313.) At discharge on June 10, 2020, Ms. Hollinger's mental status was normal except that she was anxious. (Tr. 333.) Her discharge diagnoses were bipolar I disorder, generalized anxiety disorder, and chronic PTSD. (Tr. 332.) Ms. Hollinger started treatment in an intensive outpatient program for symptoms of depression, anxiety, impaired concentration, decreased energy, mood swings, sleep problems, and stressors on June 12, 2020. (Tr. 756.) Her mental status examination revealed a sad mood, distraction, and impaired memory. (*Id.*) However, her examination was otherwise normal, revealing appropriate behavior and appearance, normal speech, normal motor behavior, normal thought content, normal thought processes, intact insight and judgment, and no suicidal or homicidal ideation. (*See id.*) Her treatment in the program continued until January 2021. (Tr. 727-965.) Her evaluations revealed a consistently anxious or dysphoric mood, and flat, congruent affect, but cooperative behavior. (Tr. 727-54, 767-964.)

On July 31, 2020, Ms. Hollinger attended an initial psychiatric evaluation with Nurse Ward. Ms. Hollinger reported symptoms of depression, including insomnia, hypersomnia, and uncontrolled worry. (Tr. 251.) Nurse Ward observed that Ms. Hollinger was neat, clean and appropriately dressed, with an engaged and accessible demeanor. (Tr. 253.) Ms. Hollinger was calm and pleasant. (Tr. 253.) She had normal speech and tangential but coherent thought process. (*Id.*) She also had a euthymic mood and full range of thoughts. (*Id.*) She had intact cognition, moderate insight, and unimpaired judgment. (Tr. 254.) Nurse Ward observed that she met the diagnostic criteria for bipolar II disorder and generalized anxiety disorder. (*Id.*)

On August 14, 2020, Ms. Hollinger attended a counseling session with Mary Henderson, LSW. Ms. Hollinger told Ms. Henderson that she had a panic attack when she realized her cat was missing. (Tr. 240.) Ms. Henderson observed that Ms. Hollinger sounded happy or excited with

congruent mood and speech/rate. (*Id.*) On August 26, 2020, a case manager met with Ms. Hollinger and noted that Ms. Hollinger presented with symptoms of anxiety. (Tr. 248.) On August 28, 2020, Ms. Henderson observed that Ms. Hollinger appeared sad or depressed with congruent mood and speech/rate at her counseling session. (Tr. 247.)

On October 28, 2020, Ms. Hollinger attended a phone appointment with Ms. Henderson. (Tr. 459.) She reported situational anxiety because of her landlord's heart attack that reminded her of her mother's two heart attacks. (*Id.*) Ms. Henderson noted that Ms. Hollinger sounded sad or depressed with congruent mood and speech/rate. (*Id.*)

On November 6, 2020, Ms. Hollinger attended a telehealth session with Nurse Ward and reported that she was "[a] little bit depressed, just stressed." (Tr. 509.) Her reported stressors were unchanged chronic pain and fatigue. (*Id.*) She reported fatigue and motivation that varied depending upon pain. (*Id.*) Upon examination, Ms. Hollinger was cooperative, engaged, and accessible. (Tr. 511.) She had speech with regular rate and rhythm and normal volume. (*Id.*) Her thought process was goal-directed, linear, and coherent. (*Id.*) She was oriented with depressed mood, intact cognition, moderate insight, and unimpaired judgment. (*Id.*)

On December 14, 2020, Ms. Hollinger attended a telehealth appointment with Nurse Ward. (Tr. 503.) Ms. Hollinger stated that she was "[n]ot quite as depressed." (*Id.*) She reported ongoing chronic pain and fatigue. (*Id.*) She was awaiting the start of physical therapy. (*Id.*) She reported some chronic low distress, but also reported that her anxiety was controlled by her current medications. (*Id.*) Upon examination, Ms. Hollinger was cooperative, engaged, and accessible. (Tr. 505.) Her speech was regular in rate and rhythm with normal volume. (*Id.*) She was oriented with euthymic mood, normal thought content/perception, intact cognition, moderate insight, and unimpaired judgment. (*Id.*)

12

At a January 28, 2021, appointment with Nurse Ward, Ms. Hollinger reported that she has "[b]een better." (Tr. 560.) Her reported stressor was that her pet fish died. (*Id.*) She reported that she was appealing her Social Security decision. (*Id.*) She reported that she started her associate degree in business and was taking online classes. (*Id.*) She reported doing well with the online format. (*Id.*) She also reported that she was "try[ing] to work through" her chronic pain and fatigue." (*Id.*) She had not started physical therapy. (*Id.*) Nurse Ward observed that Ms. Hollinger was cooperative, engaged, and accessible upon examination. (Tr. 562.) Her speech had regular rate, regular rhythm, and normal volume. (*Id.*) She was oriented with normal thought content/perception, euthymic mood, intact cognition, moderate insight, and unimpaired judgment. (*Id.*)

On February 11, 2021, Ms. Henderson explored Ms. Hollinger's management of her mental symptoms and grief/loss of her pet rabbit. (Tr. 557.) Ms. Henderson observed that Ms. Hollinger sounded depressed with congruent mood and speech and rate. (*Id.*)

On May 4, 2021, Ms. Hollinger engaged in a telehealth session with Nurse Ward. (Tr. 685.) She reported that she was "still grieving hard." (Tr. 686.) She rated her depression as an eight out of ten. (*Id.*) She reported periodical passive suicidal ideation and said that she copes by sleeping. (*Id.*) Nurse Ward observed that Ms. Hollinger was cooperative, engaged, and accessible upon examination. (Tr. 687.) Her speech had regular rate, regular rhythm, and normal volume. (*Id.*) She had goal-directed/linear and coherent thought process. (*Id.*) She was oriented with no abnormal thought content and perceptual distortions, intact cognition, moderate insight, and unimpaired judgment but depressed and irritable mood. (*Id.*)

On June 1, 2021, Ms. Hollinger attended a telehealth session with Nurse Ward. (Tr. 660.) Ms. Hollinger's reported stressors were grieving her pet rabbit that died two months prior to her

appointment, strained finances, and her disability benefits appeal. (*Id.*) She reported that "[t]hings are going," she "[s]till can't focus," and her sleep was "still weird." (Tr. 661.) She also reported emotional numbness and being "[i]n a weird place." (*Id.*) She reported residual anxiety and insomnia. (*Id.*) Nurse Ward observed that Ms. Hollinger was cooperative, engaged, and accessible upon examination. (Tr. 662.) Her speech had regular rate, regular rhythm, and normal volume. (*Id.*) Her thought process was goal-directed/linear and coherent. (*Id.*) Her mood was depressed but improving. (*Id.*) She had intact cognition, moderate insight, unimpaired judgment, and no suicidal/homicidal thoughts. (*Id.*)

On July 14, 2021, Ms. Hollinger sought emergency treatment for suicidal ideation without current plan. (Tr. 999.) She reported that her mother had been dead since February but that the authorities had only notified the person with power of attorney of her mother's death, and as a result, she had only recently learned of it. (*Id.*) Her pet fish and pet rabbit, her emotional support animal, had also died. (*Id.*) She also complained of depression, sleep problems, and decreased concentration/focus. (*Id.*) Mental status examination revealed she had fair concentration. (Tr. 1010.) Otherwise, her mental status examination was normal. (*Id.*) Specifically, Ms. Hollinger was engaged, cooperative, and well-groomed, with good eye contact, normal psychomotor activity, normal speech, normal thoughts, normal perceptions, intact insight, and appropriate judgment. (*Id.*) She also had euthymic mood with congruent, reactive, and normal affect. (*Id.*) Doctors determined it was safe to send Ms. Hollinger home with an increased medication dosage. (Tr. 999, 1007.)

On August 2, 2021, Nurse Ward assessed Ms. Hollinger at a follow up telehealth appointment. (Tr. 589.) Ms. Hollinger reported that she was "hanging in there." (*Id.*) She reported that her stressors were no longer working for Uber, recovering from viral illness, applying for

rental assistance, and appealing her Social Security benefits decisions. (*Id.*) She reported that she experienced "up and down all night" morning fatigue and daytime napping. (*Id.*) She rated depression between four to seven out of ten, attributing this rating to her unemployment. (*Id.*) She reported chronic fatigue. (*Id.*) Nurse Ward observed that Ms. Hollinger was cooperative, engaged, and accessible upon examination. (Tr. 590.) Her speech had regular rate, regular rhythm, and normal volume. (*Id.*) Her thought process was goal-directed, linear, and coherent. (*Id.*) She was oriented with euthymic, "less depressed" mood, intact cognition, moderate insight, and unimpaired judgment. (Tr. 590-91.) She did, however, report passive suicidal thoughts and chronic suicidal thoughts. (Tr. 590.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Hollinger has not engaged in substantial gainful activity since August 26, 2020, the application date. (Tr. 18-19.) The ALJ then determined that Ms. Hollinger had the following severe impairments: bipolar disorder, generalized anxiety disorder, and posttraumatic stress disorder. (Tr. 19-20.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20-22.)

The ALJ determined that Ms. Hollinger could perform a full range of work at all exertional levels except that she would be limited to performing simple, routine tasks, but not at a production rate pace; frequent interactions with supervisors, coworkers, and the public; and occasional routine workplace changes. (Tr. 22-28.) The ALJ next determined that Ms. Hollinger is unable to perform any past relevant work. (Tr. 28-29.) Considering Ms. Hollinger's age, education, work experience, and residual functional capacity, the ALJ determined there are jobs that exist in significant numbers in the national economy that Ms. Hollinger could perform, such as employment as a

kitchen helper, hand packager, and industrial cleaner. (Tr. 29-30.) Accordingly, the ALJ concluded that Ms. Hollinger was not disabled within the meaning of the Social Security Act since her application filing date. (Tr. 30.)

## V. LAW & ANALYSIS

### A. *Substantial Evidence Supports the ALJ's Severity Finding at Step Two.*

#### 1. <u>The ALJ Did Not Err in Evaluating Ms. Hollinger's Obesity and Back Pain.</u>

Ms. Hollinger contends that the ALJ failed to find that her medically determinable impairments of obesity and chronic low back pain are severe impairments at Step Two. (ECF No. 6, PageID#1093-94.) In addition, she contends the ALJ erred by failing to address her migraines at Step Two. (*Id.* at PageID#1095-96.) Ms. Hollinger argues that these impairments each imposed more than a minimal impact on her ability to perform basic work-related tasks because they would interfere with her ability to maintain attention and concentration and engage in substantial gainful activity on a full-time and sustained basis, warranting a finding that they are severe impairments. (*Id.* at PageID#1096.) She further asserts that the ALJ failed to properly consider these impairments at later steps of the sequential evaluation process pursuant to 96-8p. (*Id.*). Thus, she maintains that remand is warranted. (*Id.* at PageID#1096-97.)

At Step Two of the sequential evaluation process, an ALJ must determine whether a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step [T]wo has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs*

16

*v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988)). When an ALJ finds severe and nonsevere impairments at Step Two and continues with the subsequent Steps in the sequential evaluation process, any error at Step Two is harmless. *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987).

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

The ALJ at Step Two of her decision found that obesity and chronic low back pain were not severe impairments. (Tr. 19-20.) Ms. Hollinger contends that the ALJ erred in finding her obesity a non-severe impairment because the ALJ based her finding on a May 2019 x-ray of the lumbar spine where Ms. Hollinger weighed only 262 pounds (Tr. 379), less than the over 300 pounds she weighed at the time of the hearing. (ECF No. 6, PageID#1094.) Ms. Hollinger's argument is not well-taken because she overlooks that the ALJ also considered the treatment notes dated *on or after* Ms. Hollinger was assessed to weigh over 353 pounds. Specifically, in assessing Ms. Hollinger's obesity and chronic low back pain, the ALJ observed that Ms. Hollinger complained to her primary care provider in August 2021 that she had chronic back pain with right-

side sciatica. (Tr. 624.) Her physical examination at this time revealed that she weighed 353 pounds, had low and mid back pain, decreased lumbar range of motion, and limping gait favoring the left leg, but no focal neurological deficits. (Tr. 625.) The ALJ also discussed Ms. Hollinger's November 2021 visit to Dr. LaSalle. (Tr. 19.) The ALJ noted that Dr. LaSalle diagnosed Ms. Hollinger with chronic right-sided low back pain and increased BMI, among other things. (Tr. 19; *see* Tr. 971.) The ALJ even acknowledged the examination revealed myofascial pain, tenderness to palpation of right gluteal and right lower extremity, and poor biomechanics with gait; however, she also noted that Ms. Hollinger had normal reflexes and full lower extremity strength. (Tr. 970.) And the ALJ supported her evaluation of obesity by assessing the state agency findings, which determined that the record failed to establish a severe impairment. (Tr. 19-20.)

To challenge the ALJ's severity finding regarding her obesity and back pain, Ms. Hollinger had to demonstrate that the ALJ's finding was based on "such relevant evidence as a reasonable mind might accept as adequate to support" it. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Citing selective portions of the record that support one's own conclusion does not meet this burden. Instead, Ms. Hollinger must show that the ALJ's findings were outside her "zone of choice." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Here, Ms. Hollinger does not meet her burden of demonstrating the Step Two determination was in error.

Ms. Hollinger argues that the ALJ did not consider her obesity and back pain at later steps in the sequential evaluation process. Yet the ALJ provided her reasoning earlier in the decision regarding why Ms. Hollinger's obesity and back pain posed no greater limitations. Specifically, the ALJ noted that given Ms. Hollinger's limited, conservative scope of medical treatment and the minimal examination findings of record, her obesity and chronic low back pain posed "no more than a minimal impact on the claimant's ability to perform basic work-related tasks[.]" (Tr. 19.)

18

Later in the decision, the ALJ stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 20.) Although this discussion was not specifically in the SSR 16-3p evaluation section, courts read the decision as a whole and with common sense. *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (observing that the ALJ's rationale need not come in "tidy packing" and that courts must "read the ALJ's decision as a whole and with common sense"). Reading the opinion here as a whole and with common sense, the ALJ adequately addressed Ms. Hollinger's obesity and back pain at later steps of the sequential evaluation process.

The ALJ's evaluation of the state agency opinions, which considered the medical evidence regarding Ms. Hollinger's obesity and back pain, further supports this conclusion. Specifically, the ALJ found persuasive that the state agency opinions found no severe impairment substantiated by the medical record. (Tr. 70, 80.) In sum, Ms. Hollinger fails to demonstrate how the ALJ's decision did not consider or account for her obesity and back pain.

Further, to the extent that Ms. Hollinger would argue that the ALJ's obesity analysis was inadequate, this argument is not supported. Where a plaintiff disagrees that the analysis of obesity is adequate, she must meet the "burden of showing specifically how [her] obesity, in combination with other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC." *Foss v. Comm'r of Soc. Sec.*, No. 1:16cv1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017), *report and recommendation adopted*, 2017 WL 2908857 (N.D. Ohio July 7, 2017). "The absence of further elaboration on the issue of obesity likely stems from the fact that [plaintiff] failed to present evidence of any functional limitations resulting specifically from her obesity." *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004).

Here, Ms. Hollinger did not list obesity as a condition limiting her ability to work (Tr. 193, 200) and did not testify at her administrative hearing that her obesity limited her ability to function (Tr. 53). As demonstrated above, the medical evidence and the state agency opinions do not support that Ms. Hollinger's obesity caused limitations. And Ms. Hollinger does not present any other medical opinions corroborating obesity-related limitations to satisfy this burden. *Farrell v. Comm'r of Soc. Sec.*, No. 1:22-CV-02020-SL, 2023 WL 6882788, at *9 (N.D. Ohio Oct. 3, 2023) (Clay, M.J.) (finding plaintiff did not satisfy burden where no medical opinion or state agency opinion corroborated plaintiff's claims of obesity-related limitations), *report and recommendation adopted*, 2023 WL 6879848 (N.D. Ohio Oct. 18, 2023). Accordingly, I recommend that the Court reject this argument because it lacks merit.

### 2. Ms. Hollinger Does Not Establish that Her Migraines Were a Medically Determinable Impairment.

Ms. Hollinger also argues that the ALJ "failed to even mention whether [her frequent migraines] were an impairment." (ECF No. 6, PageID#1095.) In support, she points to medical records referencing migraines. (*Id.* (citing Tr. 249, 289, 293, 303, 305, 317, 340, 346, 354, 362, 367, 370, 372, 378, 501, 5656, 612, 658, 914.)) She states that no mention was made of this impairment "for which she was prescribed rest and medication." (*Id.* at PageID#1095-96.) She concludes that "resting daily would preclude [her] from engaging in full-time and sustained work activity necessitating a remand of this matter." (*Id.* at PageID#1096.)

Although Ms. Hollinger contends that her migraines are an impairment, she fails to make the requisite showing under agency policy that her migraines constitute a medically determinable impairment. As stated above, at step two, an ALJ must evaluate whether a claimant as a "medically determinable impairment." *See* 20 C.F.R. § 416.921. A medically determinable impairment "results from anatomical, physiological, or psychological abnormalities that can be shown by

20

medically acceptable clinical and laboratory diagnostic techniques" and must be established by objective medical evidence from an acceptable medical source." *Id.* The impairment must also meet the durational requirement—"it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909. If the ALJ finds that the claimant has a medically determinable impairment, then the ALJ determines whether that impairment is severe or non-severe. 20 C.F.R. § 416.921. "Once one severe impairment is found, the combined effect of all impairments must be considered [in determining the claimant's residual functional capacity], even if other impairments would be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009.)

Regarding headaches, the Social Security Agency promulgated SSR 19-4p to "explain [Agency] policy on how we establish that a person has a[ ] [medically determinable impairment] of a primary headache disorder and how we evaluate primary headache disorders in disability claims." SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). The regulations require that the "[medically determinable impairment] be established by objective medical evidence from an acceptable medical source." *Id.* (footnotes omitted).

SSR 19-4p provides guidance regarding a Listings analysis for primary headache disorders, stating in part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[ ] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[ ]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 2019 WL 4169635, at *16.

Here, Ms. Hollinger does not present evidence demonstrating that she met the qualifications outlined in SSR 19-4p and Listing 11.02. Specifically, her treatment notes do not reflect a diagnosis of a primary headache disorder, report on a witnessed headache, or contain any details about her reaction to treatments. (Tr. 249, 289, 293, 303, 305, 317, 340, 346, 354, 362, 367, 370, 372, 378, 502, 565.)[5] Moreover, several of her cited treatment notes merely indicate a past medical history of migraines. (Tr. 289, 293, 303, 340, 346, 367, 378, 501, 914.) Another treatment note that Ms. Hollinger relies upon is her self-report to her case manager that her "migraines have become more frequent due to stress and sleep deprivation." (Tr 658.) Yet this is not an acceptable medical source's description. While one of her cited treatment notes reflects an intractable migraine, this note does not report any limitations or the results of Ms. Hollinger's medications. (Tr. 610-612.) A "mention" or "history" of headaches does not demonstrate a diagnosis of a primary headache disorder. *See, e.g.*, *Livesay v. Comm'r of Soc. Sec.*, No. 17-CV-14214, 2019 WL 1503135, at *6 (E.D. Mich. Feb. 1, 2019) (finding that a history of present illness section of a report is "merely the narrative description of plaintiff's subjective complaints and symptoms and

---

[5] Some of these treatment notes fall outside of the relevant period. (*See generally* Tr. 289, 293, 303, 305, 317, 340, 346, 362.)

are not opinions regarding plaintiff's limitations ore restrictions") (internal quotations and citations omitted), *report and recommendation adopted*, 2019 WL 1198700 (E.D. Mich. Mar. 14, 2019).

Because Ms. Hollinger does not establish that her headaches are a medically determinable impairment such that the ALJ was required to consider them in her analysis, she cannot establish error. *See* 20 C.F.R. § 416.921 ("If you are not doing substantial gainful activity, we will then determine whether you have a medically determinable physical or mental impairment(s)…After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe."). Accordingly, I recommend that the Court reject this argument because it lacks merit.

**B.** ***Substantial Evidence Supports the Evaluation of Ms. Hollinger's Mental Health Conditions, Including Nurse Ward's Medical Opinion.***

Ms. Hollinger argues that the ALJ erred in finding that Nurse Ward's opinion was not persuasive because the evidence "supported and was consistent with the opinion of the treating certified psychiatric nurse practitioner." (ECF No. 6, PageID#1099.) Ms. Hollinger also argues that the ALJ's RFC determination that Ms. Hollinger could engage in frequent interactions was not supported by substantial evidence. (*Id.* at PageID#1102.) Finally, she argues that the ALJ improperly determined that her conditions did not satisfy the criteria for Listings 12.04, 12.06, and 12.15. (*Id.* at PageID#1103-05.) The Commissioner disagrees. (ECF No. 8, PageID#1123-29.) For the following reasons, Ms. Hollinger's arguments are not well-taken.

**1.** **The ALJ Appropriately Evaluated Nurse Ward's Medical Opinion.**

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he

considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[6]

Supportability is defined as "the more relevant the objective evidence and supporting presented by a medical source are to support his or her medical opinion []…the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1). Consistency is defined as "[t]he more consistent a medical opinion[ ]...is with the evidence from other medical sources and nonmedical sources in the claim...the more persuasive the medical opinions(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(2). In the instant case, the ALJ's decision found that Nurse Ward's opinion was not persuasive.  Specifically, the ALJ stated the following:

> [Nurse Ward's] opinion is not persuasive for several reasons. First, the opinion is inadequately supported by Mr. Ward's own treatment notes, which contain examination findings of an abnormal mood and affect, tangential thought processes, and decreased insight and judgment, but consistently normal alertness and orientation, with cooperative, calm, pleasant behavior/demeanor, good eye contact, hygiene, and grooming, normal thought content and perceptions, coherent thought processes, normal speech, and intact cognition (Exhibit B1F, B4F, B5F, B7F, B8F, B9F). In addition, the extremely restrictive opinion is inconsistent with the remaining evidence of record, including emergency department, intensive outpatient treatment, and inpatient hospitalization records, which contain evidence of an anxious, dysphoric, sad, depressed mood, a flat, congruent, restrictive affect, occasionally impaired memory, decreased attention/concentration, and impaired judgment, but cooperative behavior, appropriate appearance, normal speech, psychomotor activity, thought content, and thought processes, and intact insight (Exhibit B10F, B11F). Because the record as a whole confirms the claimant is not as limited, Mr. Ward's opinion is not persuasive.

(Tr. 28.)

The ALJ addressed the supportability factor as required under the regulations. As reproduced above, the ALJ determined that Nurse Ward's opinion was inadequately supported by his own treatment notes. Specifically, the ALJ acknowledged examination findings that

---

[6] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

demonstrated that Ms. Hollinger had abnormal mood and affect, tangential thought processes, and decreased insight and judgment. (Tr. 28; *see, e.g.*, Tr. 253-254, 296, 320, 459, 687.) However, the ALJ observed that Ms. Hollinger also demonstrated normal alertness and orientation, with cooperative, calm, and pleasant behavior/demeanor, good eye contact, good hygiene, good grooming, normal thought content and perceptions, coherent thought processes, normal speech, and intact cognition. (*See, e.g.*, Tr. 253, 505, 511, 521, 562, 577, 590, 607.)

Ms. Hollinger does not demonstrate how the ALJ's supportability finding is not supported by substantial evidence. In fact, as the ALJ concluded, Nurse Ward's opined limitations are not supported by his treatment notes, which reported consistently normal alertness and orientation, with cooperative, calm, pleasant behavior/demeanor, good eye contact, hygiene, and grooming, normal thought content and perceptions, coherent thought processes, normal speech, and intact cognition (Tr. 28.) And to the extent that Ms. Hollinger would contend that the ALJ did not consider issues with tangential thought content or other symptoms associated with her mental health conditions that may interfere with her ability to perform complex tasks, the ALJ's decision reflects that she accounted for this by limiting her to simple, routine types of work. (Tr. 25, 28.)

The ALJ also addressed the consistency factor. Here, the ALJ found Nurse Ward's opinion was inconsistent with other record evidence, including Ms. Hollinger's emergency department, intensive outpatient treatment, and inpatient hospitalization records. (Tr. 28.) Specifically, the ALJ acknowledged that these records showed evidence of an anxious, dysphoric, sad, or depressed mood; a flat, congruent, and restrictive affect; occasionally impaired memory; decreased attention/concentration; and impaired judgment. (*See, e.g.*, Tr. 307, 313, 320, 325, 756.) But the ALJ also noted that Ms. Hollinger showed cooperative behavior; appropriate appearance; normal speech, psychomotor activity, thought content, and thought processes; intact insight; and intact

cognition. (*See, e.g.*, Tr. 727, 735, 737, 752, 754, 916, 1010.) These findings demonstrate why some of Nurse Ward's extreme limitations were inconsistent with the medical record.

Ms. Hollinger contests the ALJ's opinion evaluation and recites evidence that, in her interpretation, would support the persuasiveness of Nurse Ward's opinion, and then contends that the ALJ's evaluation is erroneous. To demonstrate lack of substantial evidence, Ms. Hollinger must do more than "pointing to evidence of the record that supports [her] position" to establish a lack of substantial evidence. *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). It is not a reviewing court's role to retry the case *de novo*, reweigh the evidence, or assess credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Rather, Ms. Hollinger must demonstrate that "there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene*, 2010 WL 5021033, at *4. Ms. Hollinger makes no attempt to acknowledge or challenge the mental status findings upon which the ALJ relied on in assessing Nurse Ward's opinion. Accordingly, I recommend that the Court reject this sub-claim because it lacks merit.

## 2. <u>The ALJ Appropriately Incorporated the State Agency Opinions' Limitations into Her RFC Determination.</u>

Ms. Hollinger next challenges the ALJ's evaluation of Nurse Ward's opinion based on the state agency's opined limitations. She argues that the state agency's prior administrative medical findings opined that she required no more than "superficial" interaction with others, a finding she says supports Nurse Ward's opinion, and is inconsistent with ALJ's RFC determination that permitted up to "frequent" social interaction. (ECF No. 6, PageID#1102.) This argument is not well-taken.

I first note that although Ms. Hollinger disputes the ALJ's determination that she should be limited to frequent interactions, she does not offer any factual or legal explanation as to why

26

the RFC should have included "superficial" interaction as opposed to "frequent" interaction. (*See* ECF No. 6, PageID#1102.) Next, although the ALJ found the state agency opinions persuasive, she was not required to adopt their "superficial" interaction with others limitation "verbatim," nor was the ALJ required to explain why she did not include this limitation in her RFC determination. *See, e.g.*, *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which she gave great weight).

Furthermore, read as a whole and with common sense, the ALJ's decision adequately explained her reasoning regarding Ms. Hollinger's limitation regarding interactions with supervisors, coworkers, and the public. Specifically, the ALJ acknowledged that Ms. Hollinger experiences symptoms associated with her mental health conditions that "would reasonably interfere with her ability to perform complex tasks, interact with others, work at a rapid pace, and tolerate a stressful work environment." (Tr. 25.) Thus, the ALJ limited Ms. Hollinger to, among other things, frequent interactions with supervisors, coworkers, and the public. (*Id.*) The ALJ, however, also observed that Ms. Hollinger "is not precluded…from all interaction with others" because she had been consistently alert, oriented, cooperative, calm, pleasant, relaxed, engaged, and accessible on examination. (*Id.*) The ALJ thus concluded that, as a result, no additional mental impairment related restrictions were warranted, despite Ms. Hollinger's allegations to the contrary. (*Id.*) The ALJ's cited findings regarding why Ms. Hollinger had no more than moderate limitations in interacting with others (i.e., her ability to work for Uber, socially interact online, and mental status findings indicating normal social abilities) further support the ALJ's conclusion that Ms. Hollinger could be limited to frequent interactions with supervisors, coworkers, and the public. (Tr. 20-21.)

27

Finally, as discussed above, the ALJ articulated the supportability and consistency factors in her evaluation of Nurse Ward's opinion. In doing so, the ALJ cited evidence that supported her finding that Ms. Hollinger could tolerate frequent contact with supervisors, coworkers, and the public such as clinical findings of her being cooperative, calm, and pleasant behavior/demeanor; and good eye contact, hygiene, and grooming. (Tr. 28.)

Although Ms. Hollinger alleges that the ALJ "failed to give a coherent explanation" for her persuasiveness finding and that the ALJ "failed to view the entire record" in making that finding, a review of the ALJ's decision suggests otherwise. Because she does not demonstrate how the ALJ erred in this regard, I recommend that the Court reject this argument because it lacks merit.

### 3. The ALJ's Listings 12.04, 12.06, and 12.15 Determinations are Supported by Substantial Evidence.

Ms. Hollinger additionally contends that Nurse Ward's opinion, as well as the same evidence that supported Nurse Ward's opinion, also support a finding that Ms. Hollinger was disabled at the Step Three of the sequential evaluation process. (ECF No. 6, PageID#1103-05.) Specifically, she contends that Ms. Hollinger met the criteria of Listings 12.04, 12.06, and 12.15. (*Id.*) She maintains that she satisfied the Paragraph A and Paragraph B criteria of these listings. (*Id.* at PageID#1103-04.) She concludes that the ALJ's conclusions were contrary to the evidence in the matter. (*Id.* at PageID#1104.)

The Commissioner asserts that the ALJ appropriately determined that Ms. Hollinger did not meet the requirements for Listings 12.04, 12.06, and 12.15. (ECF No. 8, PageID#1127-29.) The Commissioner argues that the ALJ correctly determined that Ms. Hollinger had moderate limitations, rather than marked or extreme limitations, in each of the four Paragraph B domains. (*Id.* at PageID#1128-29.) The Commissioner contends that Ms. Hollinger "declines to challenge the most important supporting evidence for the ALJ's findings, including mental status

examinations and daily activities." (*Id.* at PageID#1129.) The Commissioner's arguments are well-taken.

Listings 12.04, 12.06, and 12.15 incorporate identical Paragraph B and Paragraph C criteria, which an ALJ uses to rate the severity of a claimant's mental impairments in four general areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintain pace; and adapting and managing oneself. 20 C.F.R. Pt. 404, Subt. P, App. 1, Listing § 12.00E. As stated above, Ms. Hollinger's arguments revolve around the ALJ's determinations for the Paragraph A and Paragraph B criteria. (*See* ECF No. 6, PageID#1103-04.)

The primary issue before this Court is whether the ALJ's findings were supported by substantial evidence, not whether other evidence potentially supports a greater impairment. So long as the ALJ cites substantial, legitimate evidence to support her factual conclusions, reviewing courts may not second-guess her decision. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). In relevant part, the ALJ determined that Ms. Hollinger had moderate limitations in all relevant Paragraph B criteria. The ALJ provided explanations with citations to the record to support her determination regarding the severity of Ms. Hollinger's limitations.

With respect to understanding, remembering, or applying information, the ALJ noted that Ms. Hollinger reported fatigue and sleep problems and acknowledged that Ms. Hollinger's examinations have revealed tangential thought processes and occasionally impaired memory. (Tr. 20; *see, e.g.*, Tr. 47, 52, 253-54, 756.) But the ALJ also noted that Ms. Hollinger was consistently alert and oriented on examination, with normal speech, normal thought content, coherent thought process, and intact cognition. (Tr. 20; *see, e.g.*, Tr. 300, 307, 309, 310, 313, 320, 325, 333, 505, 511.) The ALJ also discussed Ms. Hollinger's daily activities such as driving, independently caring

for her personal hygiene, writing stories, and attending online college courses. (Tr. 20; *see* Tr. 49, 252, 500.)

With respect to interacting with others, the ALJ noted that Ms. Hollinger reported limited social activities and difficulty leaving the home and being around others. (Tr. 20.) The ALJ even acknowledged Ms. Hollinger appeared sad and depressed on examination, with a depressed, sad dysphoric, anxious, and/or irritable mood, a flat, restrictive, congruent affect, tangential thought processes, and decreased insight and judgment. (Tr. 20; *see, e.g.*, Tr. 312, 727, 730.) But in support for her moderate limitation finding, the ALJ also highlighted that Ms. Hollinger has been calm, cooperative, pleasant, relaxed, engaged, and accessible on examination, with good eye contact, and normal speech and thought content. (Tr. 21; *see, e.g.*, Tr. 253, 259, 290, 312, 318, 521, 1010.) The ALJ also observed that Ms. Hollinger is able to drive and interact with her landlord and neighbors (Tr. 41-42, 49); was working as an Uber driver (Tr. 42); reported in July 2020 that she was in a long-distance relationship with her "supportive" boyfriend (Tr. 252); and reported in November 2020 that she had a roommate and online friends (Tr. 439).

Regarding concentrating, persisting, or maintaining pace, the ALJ noted that Ms. Hollinger reported difficulty with attention, concentration, and focus. (Tr. 21.) The ALJ even acknowledged that Ms. Hollinger's examinations revealed only fair attention/concentration at times. (Tr. 21; *see, e.g.*, Tr. 1010.) But the ALJ pointed out that Ms. Hollinger was consistently alert on examination, with normal psychomotor activity, and normal speech and thoughts. (Tr. 21; *see, e.g.*, Tr. 296, 300, 307, 320, 325, 333, 851.) Despite Ms. Hollinger's reports of difficulty maintaining concentration (Tr. 51-52), the ALJ observed that Ms. Hollinger also reported activities that would require some level of sustained concentration, persistence, and pace such as driving, preparing foods, using social media, and attending online college courses. (Tr. 21; *see* Tr. 41-42, 49, 500.)

Finally, regarding Ms. Hollinger's limitations for adapting or managing herself, the ALJ acknowledged that Ms. Hollinger reported persistent mood symptoms and chronic fatigue, and that the behavioral health record contained evidence of suicidal ideation that occasionally resulted in the need for emergency hospitalization or inpatient psychiatric care. (Tr. 26.) The ALJ even acknowledged that Ms. Hollinger has sounded sad and depressed on examination, with a sad, depressed, dysphoric, irritable, and/or anxious mood; a flat, restricted, congruent affect; and impaired insight and judgment. Yet, the ALJ also observed that Ms. Hollinger is able to live alone, care for pets, and independently care for her personal needs, presenting with consistently neat, clean appearance, and appropriate dress on examination. (Tr. 21; *see, e.g.*, Tr. 41, 253, 521.) In addition, despite Ms. Hollinger's persistent mood symptoms, Ms. Hollinger is able to attend appointments/sessions without any noted difficulty getting along with her mental health providers, staff, or group therapy members. (Tr. 21; *see, e.g.*, Tr. 253, 293, 297, 311-12, 521, 727-29, 744, 875-76.)

Ms. Hollinger contends that the ALJ "failed to consider all of [her] symptoms as noted and described in the evidence set forth above," referring to Nurse Ward's opinion and the same evidence she cited in support of Nurse Ward's opinion. (ECF No. 6, PageID#1105.) However, her argument fails to address the ALJ's reasoning. Ms. Hollinger does not demonstrate that no reasonable mind could have agreed with the ALJ's moderate limitations findings. *See Biestek*, 139 S. Ct. at 1154. As stated above, the Commissioner's decision must be affirmed so long as the evidence reasonably supports the conclusion. A reviewing court may not try the case *de novo*, reweigh the evidence, or assess questions of credibility. *Garner*, 745 F.2d at 387. Because Ms. Hollinger does not establish how the ALJ erred in her Listings assessment or why the ALJ's

assessment is not supported by substantial evidence, this argument lacks merit. Accordingly, I recommend that the Court reject this assignment of error.

### C.  *Substantial Evidence Supports the ALJ's SSR 16-3p Evaluation.*

Ms. Hollinger contends the ALJ "failed to articulate any supportable rationale" for declining to adopt her alleged limitations in her residual functional capacity determination. (ECF No. 6, PageID#1108.) She also argues the ALJ "ignored and disregarded" evidence and points to previously cited evidence "as set forth in detail in the preceding Arguments." (*Id.* at PageID#1106-09.) Ms. Hollinger's arguments are not well-taken.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Then, the ALJ must evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make

explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

The regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10. But the ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id*. (internal quotations and citations omitted).Here, the ALJ outlined Ms. Hollinger's testimony regarding her limitations at the administrative hearing. (Tr. 23.) The ALJ then proceeded to provide reasoning as to why Ms. Hollinger's allegations were not consistent with the record evidence. (Tr. 23-27.) The ALJ observed that the objective medical evidence did not fully corroborate Ms. Hollinger's allegations. (Tr. 23-26); *see* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5.

The ALJ also considered additional factors in evaluating Ms. Hollinger's statements concerning the intensity, persistence, duration and limiting effects of her impairments. For example, the ALJ discussed how Ms. Hollinger's activities of daily living "detract from her allegations of totally debilitating impairment," and instead support the ALJ's RFC determination.

33

(Tr. 26.) The ALJ noted that Ms. Hollinger is able to live alone, drive, do her own cooking, interact with her landlord and neighbors, and write stories. (Tr. 26; *see* Tr. 41-42, 29.) In July 2020, Ms. Hollinger indicated that she was in a long-distance relationship with her boyfriend, who is supportive. (Tr. 252.) In November 2020, Ms. Hollinger reported she had a roommate and online friends. (Tr. 439.) Daily activities are a factor that an ALJ may consider when assessing a claimant's subjective allegations. *See* 20 C.F.R. § 416.929(c)(3)(i); *Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013).

The ALJ also considered Ms. Hollinger's scope of treatment. (Tr. 26; *see* 20 C.F.R. § 416.929(c)(3)(v). The ALJ discussed Ms. Hollinger's June 2020 psychiatric hospitalization, intensive outpatient program from June 2020 through January 2021, and formal outpatient health treatment. (*Id.*) The ALJ acknowledged Ms. Hollinger's July 2021 visit to the emergency room for suicidal ideation, but also noted that medical providers ultimately determined Ms. Hollinger did not require inpatient treatment, and it was safe to discharge her to her home with an increased medication dosage. (Tr. 26; *see* Tr. 99, 1007.) The ALJ observed that, as a whole, Ms. Hollinger's mental status examination revealed generally mild to moderate psychiatric abnormalities at most, and the record confirmed improvement with medication and treatment. (Tr. 26.) Thus, the ALJ concluded that Ms. Hollinger's impairments, while severe, are "manageable with the current scope of behavioral health treatment." (*Id.*)

Ms. Hollinger also incorrectly alleges that the ALJ failed to address her chronic fatigue and include limitations related to fatigue in her residual functional capacity. (ECF No. 6, PageID#1107.) In fact, the ALJ acknowledged Ms. Hollinger's testimony that her fatigue was in part caused by her pain. (Tr. 23.) Specifically, the ALJ later noted in her discussion of Ms. Hollinger's subjective complaints that the "[t]reatment notes contain complaints of depression,

anxiety, panic attacks, decreased motivation, sleep problems, **chronic fatigue**, back pain, and stress[.]" (Tr. 24.) (emphasis added). The ALJ concluded, however, that Ms. Hollinger reported "relatively significant activities" that countered these complaints such as taking online college classes, playing video games, and writing. (*Id.*) Instead of addressing the ALJ's explicit acknowledgement of her fatigue or countering the ALJ's conclusion, Ms. Hollinger cites evidence that she believes supports her position that her reports of chronic fatigue warranted further limitations. (ECF No. 6, PageID#1106-07.) But daily activities are an appropriate factor in evaluating a claimant's subjective symptoms. *See* 20 C.F.R. § 416.929(c)(3)(i). Thus, Ms. Hollinger does not establish that the ALJ erred because, contrary to her assertion, the ALJ assessed and discounted her chronic fatigue complaints.

Ms. Hollinger recites evidence in support of her conclusion, but she does not directly challenge the evidence upon which the ALJ relied to reach her conclusion. Because Ms. Hollinger does not establish how the ALJ erred, I recommend that the Court reject this assignment of error because it lacks merit.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: January 11, 2024

s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver**

**of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).